**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BHAIRO HIRALALL,                :

               Plaintiff,      :

     -against-               :

                              :

SENTOSACARE, LLC; THROGS NECK    :

EXTENDED CARE FACILITY; THROGS NECK :

OPERATING COMPANY, LLC; ERIC       :

ELEZOVIC; RIDDEL GARDNER;         :

CONFIDENCE MANAGEMENT SYSTEMS,   :

LLC,                                  :

               Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                            MAR 18 2016

                        <u>OPINION</u>

                  13 Civ. 4437 (GBD)

GEORGE B. DANIELS, United States District Judge:

     On October 9, 2013, Plaintiff Bhairo Hiralall filed an Amended and Supplemental

Complaint (together, "Amended Complaint," (ECF Nos. 20, 20-1)) against Defendants

Sentosacare, LLC ("SentosaCare"), Throgs Neck Extended Care Facility ("the Facility"), Throgs

Neck Operating Company, LLC ("the Operating Company"), Eric Elezovic, Riddel Gardner,

Confidence Management Systems, LLC ("Confidence"). Plaintiff alleges he was subjected to

disparate treatment and a hostile work environment based on his national origin and race, and

retaliated against because of complaints about such discrimination, in violation of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2-3. (Am. Compl., at ¶¶ 53, 68, 93.) Plaintiff also

asserts a common law claim for unspecified "emotional distress." (*Id.*, at ¶¶ 119-120.) Defendants

moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. (*See* Mot. for

Summ. J., (ECF No. 34); Mem. of Law in Supp. of Mot. ("Mem."), (ECF No. 35).)

     Defendants' motion for summary judgment is GRANTED.

### I. FACTUAL BACKGROUND

     The following facts are taken from the parties' statements filed pursuant to Local Rule

56.1, (Pl.'s Rule 56.1 Statement ("Pl.'s 56.1 Stmt."), (ECF No. 79); Defs.' Rule 56.1 Statement

("Defs.' 56.1 Stmt."), (ECF No. 36)), and from Plaintiff's July 19, 2015 affidavit ("Pl.'s Aff.," (ECF No. 57)), submitted in support of his opposition to summary judgment. The facts are undisputed, unless otherwise noted, or taken in the light most favorable to Plaintiff.

Plaintiff is a Guyanese male of Indian descent who was employed at Throgs Neck Extended Care Facility ("the Facility") for over seventeen years. (Pl.'s Aff., at ¶ 3.) Throgs Neck is a 205-bed nursing home and rehabilitation facility in the Bronx. (Defs.' 56.1 Stmt., at ¶ 37.) Plaintiff began his tenure at Throgs Neck as a housekeeper on August 20, 1996. (Pl.'s Aff., at ¶ 11.) In July of 2001, Plaintiff was promoted to the Engineering Department (also known as the "Maintenance Department," (Defs.' 56.1 Stmt., at ¶ 41)), as a painter and received a salary increase. (Pl.'s Aff., at ¶¶ 12-13, 15.) The Facility also employed Plaintiff's wife, Padmini Hirallal, sister-in-law, Rohini Gunanathan, and brothers-in-law, Premenand Khubba and Shivanathan Gunanathan, at the time Plaintiff commenced the instant action. (Defs.' 56.1 Stmt., at ¶¶ 82-94.) Plaintiff's family relations identify as Guayanese of Indian descent. (*See id.*)

Plaintiff's tenure appears to have been uneventful until late 2008. In December 2008, Throgs Neck's Director of Environmental Services, Paul Gjelaj, transferred Plaintiff from Maintenance back to Housekeeping, stating that the painter position was no longer needed. (Defs.' 56.1 Stmt., at ¶ 46; Pl.'s 56.1 Stmt., at ¶ 47.) Plaintiff experienced neither a reduction in wage rate nor a reduction in benefits. (Defs.' 56.1 Stmt., at ¶ 48.) In Housekeeping, Plaintiff's duties consisted of "special project work," which included cleaning, stripping, polishing, and burnishing the facility floors with heavy machinery. (*Id.*, at ¶ 63.)

### *Supervisory Structure at Throgs Neck*

Gjelaj, of Montenegrin descent, (Pl.'s Aff., at ¶ 21), was a Throgs Neck employee who oversaw the Maintenance, Housekeeping, and Security Departments. (Defs.' 56.1 Stmt., at ¶ 44.)

According to Defendants, Gjelaj transferred Plaintiff out of the Maintenance Department because Plaintiff failed to turn off the main water valve at the Facility while attempting to replace another valve, thereby causing a flood. (*See id.*, at ¶ 47.)

Around the time of Plaintiff's transfer, Gjelaj hired his nephew, Defendant Eric Elezovic, to work in Maintenance. (*Id.*, at ¶ 49.) Elezovic played no role in his uncle's decision to transfer Plaintiff to Housekeeping. (*Id.* at ¶ 52.) Elezovic replaced his uncle as Director of Environmental Services in late May 2009. (*See id.* at ¶¶ 53-54.)

Defendant Riddel Gardner, of Jamaican descent, was Plaintiff's direct supervisor in Housekeeping until Plaintiff's July 2013 termination. (*See id.* at ¶ 61.) Gardner, in turn, directly reported to Elezovic. (*See id.* at ¶ 60.) From the time Gardner became Plaintiff's supervisor until Plaintiff's termination, Gardner was paid by Defendant Confidence Management Systems, LLC. (*See id.* at ¶¶ 58-59.)

### *2009-2012 Incidents*

In 2009, Elezovic asked Plaintiff to partially resume some of the painting Plaintiff had performed when he was in Maintenance. (*Id.*, at ¶ 65.) Plaintiff's duties were therefore a mix of Housekeeping and Maintenance responsibilities, but Plaintiff remained in Housekeeping. (*See id.* at ¶ 66.) When Plaintiff later discovered that two other employees had been hired as painters, he made at least two "informal complaints" that his transfer was unfair because of his seniority to Jody Bonura, the Facility's administrator and Corporate Compliance Officer, and to his local union shop steward. (*See* Pl.'s Aff., at ¶¶ 29-31; Oral Arg. Tr. ("Tr."), 37:24-38:12, 44:13-46:25.)

On May 13, 2010, Elezovic and Gardner increased Plaintiff's responsibilities to include burnishing sixty rooms and all hallways. (Defs.' 56.1 Stmt., at ¶ 101.) Gardner shouted at Plaintiff when Plaintiff disagreed with the assignment. (Pl.'s Aff., at ¶ 56.) Plaintiff got upset, was escorted

from the building by security, and was suspended from work for part of a day for refusing to complete the assignment. (Defs.' 56.1 Stmt., at ¶ 100; Pl.'s Aff., at ¶ 74.)   Plaintiff wrote a grievance to his union that same day complaining that his treatment was unfair and that Gardner was "unprofessional," but his letter did not mention discrimination. (Pl.'s Aff., at ¶ 95; *see also* Opp'n, Ex. 6, (ECF No. 84); Tr. at 54:10-55:2.) The next day, Plaintiff's assignment was reduced to thirty rooms. (Defs.' 56.1 Stmt., at ¶ 101.)

More than a year later, in August 2011, Elezovic offered Plaintiff a position as a "floater" who moved between the Housekeeping and Maintenance Departments, and asked Plaintiff to sign a letter acknowledging this position. (*See* Defs.' 56.1 Stmt., at ¶ 68.)   Plaintiff believed Elezovic offered him the position in response to Plaintiff's previous informal complaints, and refused to sign the letter because being a floater was "less desirable" and because it would affect his availability for his second job as security officer for the Federal Building in Jamaica, New York. (*See* Pl.'s Aff., at ¶¶ 32-35.)

After Plaintiff refused, Elezovic changed Plaintiff's duties from "special projects" to routine housekeeping work on the facility's fifth floor, where Plaintiff replaced a white female of Italian descent. (*See* Defs.' 56.1 Stmt., at ¶ 69.)   Plaintiff asserts that this routine housekeeping was less desirable than his previous special project work, and believes it was motivated by his refusal to accept the floater position. (Pl.'s Aff., at ¶ 36.)   Plaintiff experienced no loss of salary or benefits from this reassignment. (Defs.' 56.1 Stmt., at ¶ 74.)

On October 25, 2011, Elezovic accused Plaintiff of changing the posted work schedule and of watching television during his shift. (*See id.* at ¶¶ 102, 109.) When Plaintiff denied changing the schedule, Elezovic said, "You people [are] only here to make trouble." (*Id.* at ¶ 105.) The parties dispute whether Elezovic was referring to Guyanese of Indian ancestry. Elezovic testified

that he has never made any derogatory remarks regarding Guyanese persons either to Plaintiff or in Plaintiff's presence. (*Id.* at ¶ 107.) Because Gardner advised Elezovic that he, not Plaintiff, had changed the posted schedule, Plaintiff was not disciplined for the schedule change. (*See id.* at ¶¶ 103-104.)   On October 26, Plaintiff wrote two informal grievances complaining that these accusations left him "feeling victimized" and "mistreated," but did not mention any discrimination based on his race or nationality. (*See* Defs.' Reply, Ex. E, (ECF No. 104), at 1-2.)

Around November 2, 2011, Plaintiff filed a formal grievance detailing his "demotion" to Housekeeping and general mistreatment by Elezovic, including, the pressure to take the floater position Elezovic had offered him. (*See* Defs. 56.1 Stmt., ¶ 114; Pl.'s Aff., at ¶ 102; *see also* Defs.' Reply, Ex. E, at 3.)   However, Plaintiff's grievance did not complain of discrimination based on his nationality. (*See* Defs.' Reply, Ex. E, at 3.)   Plaintiff also complained that Elezovic enlisted Jamaican and Haitian Housekeeping employees to help with tasks related to the Facility's roof repairs for which Elezovic's construction company had been awarded a contract. (*See* Defs.' 56.1 Stmt., at ¶¶ 118-125.)   When Elezovic asked Plaintiff to clear roof debris, Plaintiff refused because it was outside of his job responsibilities. (*See id.* at ¶ 121.)

In April 2012, Plaintiff was reassigned to rotate lobby-cleaning shifts with employees who were of Jamaican and Albanian descent. (*Id.*, at ¶¶ 77-81.)

### *2013 Workplace Incidents and Plaintiff's Termination*

About a year and a half after Plaintiff filed his formal union grievance, on February 11, 2013, Plaintiff received a verbal warning for a pattern of absenteeism around his wife's days off. (*See id.* at ¶ 130 (citing Bonura Aff., at ¶ 8).)[1]   That same month, Elezovic and Gardner spoke

---

[1] The parties dispute the veracity and admissibility of Defendants' documentation of the incident because Plaintiff says he had not seen the February notice of discipline, (Bonura Aff., Ex. D), before his deposition. (Pl.'s 56.1 Stmt., at ¶ 130.)

with Plaintiff about a broken vacuum cleaner. (*See id.*, at ¶ 131-35.) Plaintiff denied breaking the vacuum cleaner because it broke on his day off. (Pl.'s 56.1 Stmt., at ¶¶ 131-32.) He was not disciplined. (*Id.*) Following this incident, Elezovic required all employees to sign out equipment before using it. (*See* Defs.' 56.1 Stmt., at ¶¶ 133-35.) Plaintiff complained about his treatment as unfair in an informal letter, but did not allege it was because of his national origin. (*See* Defs.' Reply, Ex. E, at 5.)

On March 12, 2013, Gardner asked Plaintiff about a broken hand sanitizer dispenser in the Facility's lobby, where Plaintiff was assigned. (*See* Defs.' 56.1 Stmt., at ¶¶ 136-38.) The record does not indicate who broke the dispenser, but Plaintiff again was not disciplined. (*See id.*) On March 14, Plaintiff reported Gardner to the Facility's Quality Assurance and Improvement Officer, Felix Stevenson, because Gardner demanded that Plaintiff's wife ask Plaintiff to clean mildew in the lobby bathroom—not Plaintiff's normal duty. (*Id.* at ¶ 139; Pl.'s Aff., at ¶ 81-83.) Plaintiff did not complain that this treatment was based on his race or nationality. (Pl.'s Dep., (ECF No. 103), at 199:9-200:8.) On March 28, when Plaintiff went to collect his and his wife's checks, Gardner told Plaintiff he could no longer sign for his wife's check because Plaintiff had reported Gardner. (Pl.'s Aff., at ¶ 83.)

Between April 3 and 5, 2013, Elezovic and Gardner increased Plaintiff's workload to include clearing the bushes of trash and emptying garbage in the lobby and offices. (Pl.'s Aff. at ¶ 84-85.) On April 15, Elezovic required Plaintiff to document his hourly activities when Elezovic asked Plaintiff to clean the Facility's conference room. (Defs.' 56.1 Stmt., at ¶¶ 146-47.) Plaintiff said that he did not have time to do so. (*Id.*) As a result of these two incidents, Plaintiff made a formal grievance to his union and to Bonura. (Defs.' Reply, Ex. E, (ECF No. 104), at 6; Bonura Dep., (ECF No. 46), at 162.) Plaintiff also filed his EEOC intake questionnaire on April 16

charging race and national origin discrimination, and the Facility received the notice of charge around April 17. Plaintiff contends that his workload increased again on April 20. (*See* Pl.'s 56.1 Stmt., at ¶¶ 143-44.)

On April 29, Elezovic warned Plaintiff for being near the Facility's Laundry Room during his shift, although Plaintiff maintains he was merely giving his paycheck to his wife. (*See* Defs.' 56.1 Stmt., at ¶ 148; Pl.'s 56.1 Stmt., at ¶ 148.) Elezovic also denied a month-long vacation request Plaintiff previously submitted on April 15. (Pl. Dep., (ECF No. 71), at 284:10-25.) On May 8, Elezovic again wrote up Plaintiff for not working during his shift. (Defs.' 56.1 Stmt., at ¶ 149; Pl.'s 56.1 Stmt., at ¶ 149.)[2]

Plaintiff reported the denial of vacation to his union, and on July 1, Elezovic approved Plaintiff's request for almost three weeks of vacation from July 31 to August 19. (*See* Pl.'s 56.1 Stmt., at ¶ 155.) On July 18, Plaintiff met with Elezovic, Gardner, and Pat Sikorski, the union steward. (Defs.' 56.1 Stmt., at ¶ 158.) At the meeting, Plaintiff complained that the night shifts failed to clean properly, thereby increasing his workload. (*Id.* at ¶ 159.) Elezovic offered Plaintiff the positions held by two Jamaican workers, but Plaintiff rejected this offer because both were less-desirable "floater" positions. (*Id.* at ¶ 160-61.)

On July 29, Elezovic requested a meeting with Plaintiff. (*Id.* at ¶ 163.) Plaintiff and Sikorski went to Elezovic's office for the meeting. (*Id.* at ¶ 165.) Plaintiff told Elezovic that he was going to record the meeting. (*Id.* at ¶ 167.) Elezovic asked Plaintiff to turn off his recording device. (*Id.* at ¶ 168.) Plaintiff refused, stating, "It's part of my attorney's advice, every meeting I have with you I must record." (*Id.* at ¶ 170.) Again, Elezovic asked Plaintiff to turn off the

---

[2] The parties also dispute the veracity and authenticity of Elezovic's May 2013 write-up because Plaintiff had never seen the document prior to his deposition.

device and then asked Sikorski to explain to Plaintiff that if Plaintiff failed to cooperate with Elezovic's directive, Plaintiff would be fired.  (*Id.* at ¶¶ 171.)  Sikorski told Plaintiff, outside Elezovic's office, to cooperate, but Plaintiff refused to do so.  (*Id.* at ¶¶ 172-73.)  Plaintiff returned to Elezovic's office, turned on the device, and refused to turn it off after Elezovic asked twice more.  (*Id.* at ¶ 174.)  Elezovic then terminated Plaintiff.  (*Id.* at ¶ 175.)  Until his termination, Plaintiff was the highest paid non-supervisory employee in the Housekeeping Department.  (Defs.' 56.1 Stmt., at ¶ 90.)

## II. PROCEDURAL HISTORY

In Plaintiff's April 16, 2013 intake questionnaire filed with the New York City office of the EEOC, he complained of discrimination by "Throgs Neck Extended Care Facility."  (Defs.' 56.1 Stmt., at ¶¶ 22-23, 27.)  The questionnaire did not name SentosaCare, Throgs Neck Operating Company, or Confidence Management Systems, LLC as employers.  (*See id.* at ¶¶ 24, 27-28.)

Although Plaintiff did not file a formal discrimination charge, the EEOC construed the questionnaire as such when it notified the Facility of the discrimination charge on April 17, 2013. (Chaiet Aff. in Supp. of Mot. for Summ. J. ("Chaiet Aff."), (ECF No. 42), at ¶ 9; Chaiet Aff., Ex. J, (ECF No. 43)).  The Facility was the only Defendant to receive formal copies of these documents until after the instant action was filed.  (Defs.' 56.1 Stmt., at ¶¶ 23, 26, 29.)

On April 18, 2013, the EEOC issued Plaintiff a Dismissal and Notice of Rights stating, "[b]ased upon its investigation, the EEOC [wa]s unable to conclude that the information obtained establishes violations of the statutes."  (*Id.* at ¶¶ 31-32.)  After obtaining counsel on June 7, 2013, Plaintiff requested that the EEOC reconsider its decision, and the EEOC again found "no indication that, upon further investigation, the Commission would conclude that discrimination had occurred."  (*Id.* at ¶¶ 34-35.)

Plaintiff commenced this action on June 26, 2013, within ninety days of his receipt of the April 18 letter, (*see* Compl., (ECF No. 1)), alleging employment discrimination, retaliation, and emotional distress perpetrated by Sentosacare, LLC, "Throgs Neck Extended Care Facility a/k/a Throgs Neck Extended Care Facility Family and Friends Association, Inc.," Throgs Neck Operating Company, LLC, Elezovic, and Gardner. (Compl., at ¶¶ 4-11.) On October 10, 2013, Plaintiff filed an Amended and "Supplemental" Verified Complaint, adding Defendant Confidence Management Services, LLC. (*See* Am. Compl., at ¶¶ 12-16.)

### III. LEGAL STANDARD

Summary judgment is appropriate where the record establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir. 1996); *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 56 (2d Cir. 2004).

To defeat a motion for summary judgment, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "To satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. To the extent that these affidavits contain bald assertions and legal conclusions—for example, that [a co-worker] 'was always making racial slurs about minorities,' and that [the plaintiff] 'was working in a hostile or abusive working

environment'—the district court [can] properly refuse[ ] to rely on them." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citations omitted); *see Hicks v. Baines*, 593 F.3d 159, 167 (2d Cir. 2010); *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995).

## IV. PROPER DEFENDANTS TO THIS ACTION[3]

Defendants argue that this Court should dismiss Plaintiff's Title VII claims against Defendants Sentosacare and Confidence Management because they were not Plaintiff's employer.[4] (*See* Mem. at 19 (citing Defs.' Rule 56. 1 Statement, at ¶¶ 2-21).) Plaintiff was undisputedly hired by the Facility defendant, which has been owned and run by the Operating Company defendant since 2004. (Defs.' 56.1 Stmt., at ¶¶ 38-39.) Plaintiff is not on SentosaCare or Confidence Management's payrolls. (*Id.*)

Generally, an employer-employee relationship exists for Title VII purposes when a plaintiff appears on the employer's payroll (the "payroll method"). *See Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 206 (1997). However, courts in this Circuit have recognized two exceptions to the payroll method. First, the joint employer doctrine allows a formal employee of one entity to impose liability for violations of employment law on another legal entity when the

---

[3] Defendants argue that Elezovic and Gardner are not proper parties, (*see* Mem. at 18), to this lawsuit because Title VII does not provide for causes of action based on supervisory liability. *See Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 59 (2d Cir. 2004) (holding that the District Court properly dismissed plaintiff's Title VII claim against an individual supervisor) (citing *Gregory v. Daly*, 243 F.3d 687, 689 n.1 (2d Cir. 2001)). Plaintiff withdrew claims against Elezovic and Gardner as individuals at oral argument. (Tr., at 14:14-18.)

[4] Defendants also raise this argument as to Throgs Neck Extended Care Facility Family and Friends Association. (*See* Mem. at 3, 19.) Outside of one mention in the Amended Complaint, (Am. Compl., at ¶ 6), Plaintiff makes no arguments or provides any evidence regarding this entity, and the record establishes that the Facility has never been known as "Throgs Neck Extended Care Family and Friends Association" ("the Association"). (Defs.' 56.1 Stmt., ¶¶ 2-6.) Plaintiff also conceded at oral argument the Association is not a proper defendant. (Tr., at 2:11-18.)

entities "handle certain aspects of their employer-employee relationship jointly." *Echevarria v. Insight Med., P.C.*, 72 F. Supp. 3d 442, 459 (S.D.N.Y. 2014) (internal quotation marks omitted), and "the joint employer knew or should have known of the [discriminatory] conduct and failed to take corrective measures within its control." *Lima v. Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009), *aff'd sub nom, Lima v. Adecco &/or Platform Learning, Inc.*, 375 F. App'x 54 (2d Cir. 2010); *see also Coleman v. Nonni's Foods, LLC*, No. 15 CV 2791, 2015 WL 8773467, at *4 (S.D.N.Y. Dec. 14, 2015).

The second exception, the single employer or integrated employer doctrine, applies when a plaintiff demonstrates a sufficient interrelationship between the immediate corporate employer and the affiliated corporation to justify liability. *Echevarria*, 72 F. Supp. 3d at 458 (internal citation omitted). This Circuit considers four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial support." *Lima*, 634 F. Supp. 2d at 400 (internal quotation marks omitted); *see also Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1240–41 (2d Cir. 1995) (adopting four-factor test). The four-factor test may be satisfied by showing "an amount of participation [that] is sufficient and necessary to the total employment process, even absent total control or ultimate authority over hiring decisions." *Cook*, 69 F.3d 1241 (citation and internal quotations omitted).

Plaintiff conclusorily argues that SentosaCare and Confidence Management are "intertwined by agreement, by ownership, and by management, in making, implementing, and overseeing compliance with Title VII" with the Facility, and therefore should be held liable for the Facility's actions. (Opp'n at 3-4 (citing Philipson Aff., (ECF No. 37), at ¶¶ 2, 5-6)).

A reasonable jury, could not find, under either exception, that Confidence Management had any control over the terms and conditions of Plaintiff's employment. *See Cook*, 69 F.3d at

1240.  While Confidence Management provides training to the Facility's management and staff regarding government compliance, and had Defendant Gardner on its payroll for the time Plaintiff worked at the Facility, (Opp'n at 5), Plaintiff has presented no other evidence showing interrelation of operations, centralized control of labor relations, common management, and common ownership or financial support.  *See Lima*, 634 F. Supp. 2d at 402.

The Facility's relationship with SentosaCare is closer than its relationship with Confidence Management.  However, Plaintiff still has not demonstrated a sufficient degree of interrelatedness under either theory of joint liability.  First, Plaintiff fails his evidentiary burden as to the joint employer test because he has provided no evidence to show that Bent Philipson, managing partner of the Facility, Jeff Goldstein, the SentosaCare management consultant who helped hire Bonura, or any other SentosaCare personnel "knew or should have known of the [discriminatory] conduct and failed to take corrective measures within its control."  *See Lima*, 634 F. Supp. 2d at 399 (internal citation omitted).  Second, as to the integrated employer test, only one of the *Cook* factors tips in Plaintiff's favor: Philipson owns 22.5% of the Operating Company and 50% of SentosaCare, (Defs.' 56.1 Stmt., at ¶¶ 11-13), demonstrating a degree of common ownership (the fourth factor).  *See Lima*, 634 F. Supp. 2d at 400 (internal citations omitted).  The degree of interrelation of operations and common management—the first and third *Cook* factors—that Plaintiff has demonstrated, however, is insufficient to conclude that SentosaCare and the Facility are integrated with regard to Plaintiff's employment.  *See Lima*, 634 F. Supp. 2d at 400 (internal citations omitted).  SentosaCare appears to have played a role in hiring Jody Bonura and Paul Gelaj.  (*See* Sept. 9, 2014 Bonura Depo., (ECF No. 75-1), at 10:13-12:16, 92:13-93-5; Bonura Aff., (ECF No. 40), at ¶¶ 2-4.)  But, the focus of these theories of joint liability is on how SentosaCare affected *Plaintiff's* employment—not on whether SentosaCare merely participated in the Facility's

hiring of Elezovic, who later terminated Plaintiff. *See Lima*, 634 F. Supp. 2d at 401.  SentosaCare did not contract Plaintiff's employment to the Facility or vice versa.  (*See* Tr. at 7:21-9:11.)[5] SentosaCare's contract with the Facility provides that "[t]he Facility shall direct and supervise, in its sole discretion, all personnel of the Facility," including Plaintiff.  (*See* Philipson Aff., Ex. B, at 6.)  Pursuant to that same contract, "[t]he Facility retain[ed] direct, independent authority over the appointment and/or dismissal, in its sole discretion, of the Facility's personnel."  (*See id.* at 7.) Even when viewed in the light most favorable to Plaintiff, SentosaCare's relationship is too attenuated to create a genuine issue of material fact at trial.

Defendants SentosaCare and Confidence Management are therefore improper parties to this action.[6]

## V. TITLE VII CLAIMS

Title VII of the Civil Rights Act of 1964 forbids employment discrimination against any individual based on that individual's "race, color, religion, sex, or national origin." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (citing 42 U.S.C. § 2000e–2(a)).   A plaintiff may base a discrimination claim on two types of prohibited acts: (1) the employer's disparate treatment, or 2) the employer's maintenance of a hostile work environment.  *See*

---

[5] Plaintiff's counsel conceded as much at the oral argument:

> The Court: [D]oes your client have any direct relationship with any other entity other than Throgs Neck Extended Care Facility?   Do you have any other relationship other than through his employment with Throgs Neck Extended Care Facility?

> Ms. Vale: Other than his employment, no.

(Tr., at 9:6-11.)

[6] Defendants also contend that Plaintiff did not name Defendants SentosaCare or Confidence Management in his EEOC charge, thereby failing to provide notice, serve Defendants, and exhaust his administrative remedies as to those Defendants. (*See* Mem. at 20.)

*Littlejohn, v. City of New York*, 795 F.3d 297, 312, 320 (2d Cir. 2015). Title VII also provides that an employer may not retaliate against or punish an employee's opposition to employment discrimination. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2525 (2013) (citing Title VII, § 2000e–3(a)).

As an initial matter, Defendants argue that any incidents on which Plaintiff bases his Title VII claims occurring before June 20, 2012, are time-barred by the three-hundred-day statute of limitations for filing discrimination complaints with the EEOC. (*See* Mem. at 9, 13, 19-20.) In Title VII actions, a plaintiff may sue in federal court only after filing timely administrative charges with the EEOC and receiving a right-to-sue letter. *See* 42 U.S.C. § 2000e-5(f)(1); *Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 562-63 (2d Cir. 2006). To be timely, a Title VII plaintiff must file charges within three-hundred days of the occurrence of the allegedly discriminatory action. 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *see also Weiss v. Morgan Stanley Inv. Mgmt.*, No. 05 CV 3310, 2008 WL 821813, at *4 (S.D.N.Y. Mar. 27, 2008), *aff'd*, 345 F. App'x 713 (2d Cir. 2009). In this case, Plaintiff submitted his intake questionnaire to the EEOC on April 16, 2013 and received his right-to-sue letter on April 18, 2013. (Defs.' 56.1 Stmt., at ¶¶ 22-24, 31.) The relevant period for Plaintiff's actionable Title VII claims therefore began on June 20, 2012, three hundred days prior to Plaintiff filing his EEOC charge. *See* 42 U.S.C. § 2000e-5(e)(1).

Discrete discriminatory or retaliatory acts that occur prior to the three-hundred day period are not actionable under Title VII even if they relate to other timely filed charges. *See Morgan*, 536 U.S. at 113; *see also Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 157 (2d Cir. 2012) (holding the same). However, time-barred incidents "'may constitute relevant background

evidence in a proceeding in which the status of a current practice is at issue,'" *Morgan*, 536 U.S. at 112 (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977)).

Plaintiff contends that claims relating to incidents occurring prior to June 20, 2012 are preserved by the continuing violation doctrine, and therefore should not be time-barred. (*See* Opp'n at 10.) "[A] plaintiff who files a timely EEOC charge about a particular discriminatory act committed in furtherance of an ongoing policy of discrimination extends the limitations period for all claims of discriminatory acts committed under that policy even if those acts, standing alone, would have been barred by the statute of limitations." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997) (internal citations omitted). However, "[a]s a general rule, courts in the Second Circuit have viewed continuing violation arguments with disfavor." *Bernstein v. The MONY Grp., Inc.*, 228 F. Supp. 2d 415, 418 (S.D.N.Y. 2002) (quoting *Curtis v. Airborne Freight Corp.*, 87 F. Supp. 2d 234, 244 (S.D.N.Y. 2000) (internal citation and quotation marks omitted)). Plaintiff presents no evidence of specific ongoing policies or practices of discrimination or retaliation, such as discriminatory seniority lists or employment tests. *See Lightfoot*, 110 F.3d at 907. Here, Plaintiff merely offers conclusory statements that "discrimination has been pervasive, and continuous at the facility from 2008 through current, through nepotism, cronyism, and their ally [sic] –disparate treatment." (*See* Opp'n at 10.) Thus, Plaintiff's claims of discrimination or retaliation arising from incidents occurring prior to June 20, 2012 are time-barred.

To determine the timeliness of hostile work environment claims, the Second Circuit employs a different test set forth in *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70 (2d Cir. 2010), because, in direct contrast to discrete acts, hostile work environments occur over a series of days or even years. *See Morgan*, 536 U.S. at 115 (internal quotation marks omitted). Courts should determine (1) whether the plaintiff alleged any discriminatory act within the limitations

period, and (2) whether the acts that took place within the limitations period "were sufficiently related to" acts outside of the limitations period "to be part of the same alleged hostile work environment practice." *McGullam*, 609 F.3d at 76-77.

Within the limitations period, Plaintiff points to incidents starting in February 2013 that he claims contributed to a hostile work environment. Plaintiff states Gardner falsely accused him of breaking equipment on February 11 and March 12, and Elezovic increased Plaintiff's workload and required him, and only him, to document his hourly activities starting on April 15. (Defs.' 56.1 Stmt., at ¶¶ 130-35, 144-46). For continuing violation purposes, Plaintiff's December 2008 transfer to Housekeeping by Gjelaj, the May 2010 disagreement between Plaintiff and Gardner that resulted in Plaintiff being escorted from the Facility and suspended for half a day, the "floater" offer from Elezovic in August 2011, and Elezovic's October 2011 accusation that Plaintiff tampered with the posted work schedule, are not sufficiently related to the timely incidents to make them part of the same hostile work environment to bring the older incidents within the statute of limitations. *See McGullam*, 609 F.3d at 77. The only relationship between the timely and untimely incidents is that Elezovic was the adversarial party in most of the incidents. The intervening gap of almost a year and a half (October 25, 2011 until February 11, 2013) between the last untimely incident and the first timely incident is too lengthy to find that that all of these incidents are part of one continuing violation, such as to withstand the time bar. Accordingly, the incidents occurring prior to June 20, 2012 are not justiciable for purposes of analyzing Plaintiff's hostile work environment claim.

## A. RACIAL AND NATIONAL ORIGIN DISPARATE TREATMENT

Courts analyze disparate treatment claims using the three-part burden-shifting framework set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). *Littlejohn*, 795 F.3d at

312. To defeat a motion for summary judgment under this framework, a plaintiff must establish a prima facie case of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). Accordingly, a plaintiff must show (1) membership in a protected class, (2) qualification for the position he held, (3) an adverse employment action, and (4) that the adverse employment action occurred under circumstances that give rise to an inference of discrimination. *Littlejohn*, 795 F.3d at 312. A plaintiff's burden at this stage is *de minimis*. *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 114 (2d Cir. 2007).

If a plaintiff establishes a prima facie case, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Feingold v. N.Y.*, 366 F.3d 138, 157 (2d Cir. 2004) (citation omitted). While an employer "must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's [adverse employment action]," the employer "need not persuade the court that it was actually motivated by the proffered reasons." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-255 (1981).

If the defendant articulates a legitimate, non-discriminatory business justification for the adverse employment action, "the presumption of . . . discrimination dissolves, and the burden shifts back to the plaintiff" who must prove that the employer's stated reasons are mere pretext for a discriminatory motive. *Weiss*, 2008 WL 821813, at *4. To defeat a motion for summary judgment, "[i]t is not enough . . . to disbelieve the employer; the fact[-]finder must [also] believe the plaintiff's explanation of intentional discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks omitted).

The parties do not dispute two of the four elements of a prima facie case: whether Plaintiff belongs to a protected class, as Plaintiff is Guyanese of Indian descent, and whether he was qualified for the position he held. *See Ruiz v. Cnty. Of Rockland*, 609 F.3d 486, 491–92 (2d Cir.

2010). However, Plaintiff has not demonstrated that the circumstances surrounding the allegedly adverse employment actions raise an inference of discrimination.

An adverse employment action is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Littlejohn*, 795 F.3d at 312 n.10 (internal quotation marks omitted). Rather, it is "a materially significant disadvantage" with respect to the terms and conditions of a plaintiff's employment, *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004), such as termination, demotion, "a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 204 (2d Cir. 2006) (citing *Williams*, 368 F.3d at 128).

Plaintiff's first timely incident was being accused of breaking a vacuum in February 2013. (Defs.' 56.1 Stmt., at ¶ 131.) Gardner similarly accused Plaintiff in March of 2013 of breaking a hand sanitizer. (Pl.'s Aff., at ¶ 80; Defs.' 56.1 Stmt., at ¶¶ 136-38.) The parties do not dispute that Plaintiff was not disciplined in response to either incident. (Defs.' 56.1 Stmt., at ¶¶ 131-32, 138.) Plaintiff also complains that on April 15, 2013, Elezovic forced him to keep an hourly log of his activities and that his workload increased after Plaintiff refused Elezovic's request to clean the Facility's conference room. (*See* Pl.'s 56.1 Stmt., at ¶¶ 143-44; Defs.' 56.1 Stmt., at ¶¶ 144-46 (citing Pl.'s Dep., (ECF No. 45), at 204:20-205:25; 206:3-22).) Two weeks later, on April 29, Elezovic denied a month-long vacation request Plaintiff had previously submitted on April 15. (Defs.' 56.1 Stmt., at ¶ 154; Pl.'s Dep., (ECF No. 71), at 284:10-25.) Also on April 29, Elezovic yelled at Plaintiff and issued a written warning when Plaintiff was in the doorway of the Facility's laundry room to give his wife his paycheck. (Pl.'s Aff., at ¶ 112.) On May 8, Elezovic issued another written warning for having a non-work-related conversation with another employee in the

copy room, (*see* Bonura Aff., Ex. F), a written warning which, at his deposition, Plaintiff attested

he had never seen before. (Pl.'s Dep., (ECF No. 71), at 328:8-12.)[7]

This Circuit does not recognize the incidents, however unpleasant, occurring prior to

Plaintiff's July 29 termination as adverse employment actions. *See Figueroa v. City of N.Y.*, 198

F. Supp. 2d 555, 568 (S.D.N.Y. 2002) ("While adverse employment actions extend beyond readily

quantifiable losses, 'not everything that makes an employee unhappy is an actionable adverse

action.'") (quoting *Phillips v. Bowen,* 278 F.3d 103, 117 (2d Cir. 2002)).   The accusations

regarding the broken vacuum and hand sanitizer dispenser, for which Plaintiff received no

disciplinary action, do not constitute adverse employment actions. *See Hawana v. City of N. Y.*,

230 F. Supp. 2d 518, 528 (S.D.N.Y. 2002) ("Negative evaluations can be adverse employment

actions only if they give rise to material adverse changes in work conditions.") (citing *Figueroa*,

198 F. Supp. 2d at 568).   Similarly, the written warnings Plaintiff received on April 29 and May 8

for allegedly shirking his duties, which Plaintiff does not contend were accompanied by changes

to his employment, cannot amount to adverse employment actions. *See id.*; *Boyd v. Presbyterian

Hosp. in City of N. Y.*, 160 F. Supp. 2d 522, 537 (S.D.N.Y. 2001) ("To the extent that Plaintiff

argues [his supervisor] wrongfully included incidents and errors on Plaintiff's performance

evaluations that never took place, these alleged actions do not constitute an adverse employment

action."). The denial of Plaintiff's initial vacation request, which only occurred once, is also not

---

[7] Defendants note that Plaintiff does not argue that racial discrimination was a reason for his July 29, 2013 termination. He only argues retaliation. (*See* Defs.' Mem. at 12; Pl.'s Opp'n, at 19 ("Retaliation was swift and strong.  From increased work-load [sic], to stalking, to accusations, to denial of vacation time, to [Plaintiff's] termination on July 30 [sic], 2013."); Pl.'s Aff., at ¶ 117 ("The firing for insubordination was nothing more than a pre-text [sic] to retaliate against me for my complaint to the EEOC.").)

an adverse employment action. *Boyd*, 160 F. Supp. 2d at 537 (finding that denial of vacation request is not cognizable adverse employment action).

As Plaintiff has failed to establish the third prong of his prima facie case of discrimination under Title VII, Defendants' motion for summary judgment as to this claim is GRANTED.[8]

## VI. HOSTILE WORK ENVIRONMENT CLAIM

To prevail on a hostile work environment claim, a plaintiff must demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320-21 (citing *Harris*, 510 U.S. at 21). A plaintiff must also show "that a specific basis exists for imputing the conduct that created the hostile environment to the employer," *Schwapp*, 118 F.3d at 110 (internal quotation marks and alterations omitted), and that the conduct occurred because of his membership in a protected class. *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). "Title VII does not prohibit employers from maintaining nasty, unpleasant workplaces . . . ." *Krasner v. HSH Nordbank A.G.*, 680 F. Supp. 2d 502, 513 (S.D.N.Y. 2010), and "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations and quotations omitted).

Defendants correctly argue that Plaintiff's evidence regarding his supervisors' unprofessional behavior does not demonstrate an actionable hostile work environment. (Mem. at

---

[8] Even if this Court were to find that Plaintiff had established the first three elements of a prima facie case of disparate treatment, Plaintiff has not demonstrated circumstances giving rise to an inference of discrimination. The record establishes that the Facility employs other Guyanese workers of Indian descent, including Plaintiff's wife and other family members, who continued to work at the Facility after Plaintiff's termination. (*See* Defs.' 56.1 Stmt., at ¶¶ 89, 92-99.)

13.)  Plaintiff has not shown any admissible evidence that Elezovic or Gardner had a pattern of activities specifically motivated by animus towards Guyanese of Indians descent.  *See Alfano*, 294 F.3d at 374; (Tr. at 57:19-59:2).  Plaintiff's sole "smoking gun" incident, in which Elezovic accused him of tampering with the posted work schedule and yelled "You people [are] only here to make trouble,"[9] (Defs.' 56.1 Stmt., at ¶ 105), is far from the "steady barrage of opprobrious racial comments" or extremely serious isolated incidents that are actionable under Title VII.  *See Schwapp*, 118 F.3d at 110-11 (citation omitted).  It is also time-barred.  *Alfano*, 294 F.3d at 372.

Plaintiff also contends that Elezovic's practice of hiring his relatives, all of Albanian or Montenegrin descent, shows that he discriminated against Guyanese of Indian descent, as well as non-Indians of Guyanese descent who are not Albanian or Montenegrin.  (Tr. at 57:24-58-1.)  Nepotism, in this case, is not evidence of actionable discrimination because showing a preference for one's family members, to the detriment of several other races or nationalities, does not amount to disparate treatment against a protected class.  *See Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*, 691 F. Supp. 2d 372, 384 (S.D.N.Y. 2009) (finding evidence of nepotism and cronyism insufficient to show that defendant's practices "actually caused disparate impact on minority union members"); *Rebele v. Potter*, 818 F. Supp. 2d 534, 538 (E.D.N.Y. 2011) ("Pernicious though [nepotism] is, it does not constitute a form of discrimination under Title VII.").  Having failed to show a sufficient frequency of events motivated by racial animus towards Plaintiff, Defendants' motion for summary judgment on this claim is GRANTED.

---

[9] At Elezovic's deposition, neither party asked Elezovic if he was referring to Indians or persons of Guyanese descent when he made that statement.  (*See* Elezovic Dep., (ECF No. 46), Ex. P; Elezovic Dep., (ECF 81-2), Ex. 4.)

## VII. RETALIATION CLAIMS

Section 704(a) of Title VII prohibits an employer from retaliating against employees for opposing any practice that violates Title VII. *See Littlejohn*, 795 F.3d at 315 (quoting 42 U.S.C. § 2000e–3(a)). Retaliation claims, like disparate treatment claims, are analyzed using the three-part test outlined in *McDonnell-Douglas*. *See id.* To demonstrate a prima facie case of retaliation, "a plaintiff must submit sufficient admissible evidence to allow a trier of fact to find: (i) conduct by the plaintiff that is protected activity under Title VII; (ii) of which the employer was aware; (iii) followed by an adverse employment action of a nature that would deter a reasonable employee from making or supporting a discrimination claim; (iv) that was causally connected to the protected activity." *Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014) (internal citation omitted).

Once a plaintiff establishes a prima facie case, the burden of production shifts to the employer to put forth evidence of a non-retaliatory rationale for the adverse action. *See id.* (citing *Holt v. KMI–Continental*, 95 F.3d 123, 130 (2d Cir. 1996)). Once the defendant has done so, the plaintiff may prevail by demonstrating that the stated rationale is pretextual. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173, 179–80 (2d Cir. 2005). The employee at all times bears the burden of persuasion to show a retaliatory motive. *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993).

### 1. Protected Activity About Which Defendants Were Aware

"Protected activity" under Title VII refers to a plaintiff's action "taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (citing 42 U.S.C. § 2000e–3), *superseded on other grounds by* N.Y.C. Local L. No. 85. Opposition need not be formal to receive statutory protection and includes such informal

protests as "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Littlejohn*, 795 F.3d at 317 (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). For an employee's opposition to be protected, it must relate to the defendant's alleged violations of Title VII such as race, gender, or other prohibited discrimination or the creation of a hostile work environment on the basis thereof. *See id.*

Many of the operative facts on which Plaintiff bases his retaliation claim are the same ones on which he bases his disparate treatment claims, and are subject to the same time bar excluding incidents prior to June 20, 2012. On March 14, 2013, Gardner took Plaintiff's wife to a restroom and asked her to tell Plaintiff he had to clean the mildew there even though Plaintiff is not normally responsible for that task. (Pl.'s Aff., at ¶¶ 81-84.) Plaintiff reported Gardner to Stevenson and Bonura, for the March 14 incident. (*Id.*) On March 28, Gardner told Plaintiff he could no longer sign for his wife's check because Plaintiff had reported him to Stevenson. (*Id.*)

Plaintiff offers no admissible evidence that his March 2013 complaint to Stevenson and Bonura protested discrete acts of race or national origin-based discrimination or a hostile work environment caused by such discrimination. (*Compare* Am. Compl., at ¶ 102; Pl.'s Aff., at ¶ 83 with Defs.' Reply, Ex. E, at 5.) Thus, the March 2013 internal complaint does not constitute protected activity cognizable by Title VII. *See Littlejohn*, 795 F.3d at 317.

Around April 15, Plaintiff filed an undated union grievance complaining about increases in his workload and being made to document his hourly activities for Elezovic. (*See* Opp'n, Ex. 6 at 2.) Plaintiff's union grievance also fails to mention any type of activity on the part of Defendants motivated by racial or similar animus. (*See id.*) Viewing Plaintiff's time-barred May 2010 union grievance as permissible background evidence regarding a discriminatory policy does not help

Plaintiff either, as that grievance does not protest specific acts or policies of impermissible racial discrimination. (*See id.*, at 1.) Rather, Plaintiff's union grievance protests being escorted from the building by security after confronting his supervisors for their rudeness and "harassment," which Plaintiff believed was a form of revenge motivated by his complaints to Bonura about his revised work schedule and increase in workload. (*See id.*) Thus, Plaintiff has not provided sufficient admissible evidence that would enable a reasonable jury to find that the April 2013 union grievance constituted a protected activity. *See Littlejohn*, 795 F.3d at 317.

Plaintiff's April 16, 2013 EEOC intake questionnaire alleging racial and national origin discrimination constitutes protected activity sufficient to demonstrate the first prong of a prima facie case. *See Raniola v. Bratton,* 243 F.3d 610, 624–25 (2d Cir. 2001). Furthermore, Defendants received notice of the charge of discrimination around April 17, satisfying the second element of a prima facie case of retaliation. *See Cox*, 760 F.3d at 145.

## 2. Adverse Employment Action

In the retaliation context, this Circuit defines "adverse employment action" more broadly than in the discrimination context. *See Hicks v. Baines,* 593 F.3d 159, 165 (2d Cir. 2010) (citing *Kessler*, 461 F.3d at 207); *Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 196 (E.D.N.Y. 2015). Materially adverse actions for the purposes of a *prima facie* retaliation case are those that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks*, 593 F.3d at 162.

The parties do not dispute that Plaintiff's termination on July 29, 2013 constituted an adverse employment action. (Defs.' 56.1 Stmt., at ¶¶ 164-175.) They do, however, disagree about the incidents occurring between the April 15 filing of the intake questionnaire and Plaintiff's termination. Even in light of the lower threshold, much of the conduct Plaintiff contends are

retaliatory adverse employment actions are objectively too trivial to dissuade a reasonable employee from making or supporting a charge of discrimination. *See White*, 548 U.S. at 68. For example, "petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.* Elezovic's April 29 denial of Plaintiff's vacation request and written warning, and his May 8 written warning to Plaintiff, (Bonura Aff., Ex. E-F), (Defs.' 56.1 Stmt., at ¶ 154), are too trivial deter a reasonable employee from speaking out against Title VII violations. *See White*, 548 at 68.; *Jackson v. NYS Dep't of Labor*, 709 F. Supp. 2d 218, 228 (S.D.N.Y. 2010) (citing *Anemone v. Metro. Transp. Auth.,* 410 F. Supp. 2d 255, 266 (S.D.N.Y. 2006) (collecting cases)). While the parties dispute[10] the accuracy and veracity of Elezovic's write-ups, none of the disputes are material. Even when an accusation in a disciplinary notice is allegedly false, this Circuit has not found such false accusations, without more, to be a cognizable retaliatory adverse employment action. *See Cody v. Cty. of Nassau*, 345 F. App'x 717, 719 (2d Cir. 2009).

On the other hand, the Second Circuit has recognized that an increase in workload may sometimes be an adverse action for the purposes of a retaliation claim if the increase is heavily disproportionate to other employees similarly situated. *See Paul*, 97 F. Supp. 3d at 196 (citing *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997)).

Plaintiff claims Elezovic increased his workload on April 20, after the Facility received notice of Plaintiff's charge of discrimination. (Pl.'s Aff., at ¶ 105). Plaintiff states that Elezovic

---

[10] Elezovic wrote in the April 29 disciplinary action notice that Plaintiff was in the "Label Room" "hanging out" when he should have been working, (Bonura Aff., Ex. E), and Defendants' Rule 56.1 Statement places the incident in "the doorway to the Facility's Laundry Room." (*See* ¶ 148.) Plaintiff contends that he was by the "doorway . . . [of] the laundry room" only to give his wife his paycheck while on his break. (Pl. Dep., at 207:13-18.)

and Gardner added the following on April 3,[11] prior to filing the EEOC intake questionnaire: clearing the bushes of trash and cleaning "all the garbage pails in the lobby area and offices, a project that had been done routinely by another employee as a special project." (*Id.*, at ¶¶ 84-85). Plaintiff also states that on April 20, he suffered the same increase in workload: "[t]rash had to be cleaned from the bushes" and he was "told [he] was to clean all the garbage pails in the lobby area and offices, a project that had been done routinely by another employee as a special project." (*Id.*, at ¶¶ 108-109; Pl.'s 56.1 Stmt, at ¶ 143.)   Although it is a district court's duty in the context of summary judgment to assess the facts presented in a light most favorable to the non-movant, *Paul*, 97 F. Supp. 3d at 178, Plaintiff cannot have had the same increase twice, if his previous workload already included those tasks.   Nonetheless, even if a reasonable jury could find that the increase in workload occurred after the filing of the intake questionnaire, Plaintiff has not shown sufficient evidence that his increase in workload was disproportionate to other similarly situated employees in his department. *See Feingold*, 366 F.3d at 153; (*see* Pl.'s Aff., at ¶ 105 (stating that a Jamaican employee had the same routine on alternating weekends); Opp'n, Ex. 18 (Plaintiff's work schedules).)

Therefore, aside from his termination, Plaintiff has not sufficiently demonstrated any facts with which a reasonable jury could conclude that the other events between April 15 and his termination were cognizable adverse employment actions.

---

[11] During his deposition, when introduced to Defendant's Exhibit 42, a copy of his new, increased assignment dated April 5, 2013 (prior to when he filed the intake questionnaire at the EEOC), Plaintiff stated that the exhibit showed the additional tasks he had been assigned. (*See* Pl. Dep., (ECF No. 45), Ex. N, at 341.)

### 3. Causal Connection to Protected Activity

To support a prima facie case of retaliation, Plaintiff argues that his July 29, 2013 termination[12] was causally connected to the EEOC questionnaire he filed on April 16. (Opp'n at 19.) "[A] plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar,* 133 S.Ct. at 2534. This Circuit has held that *Nassar*'s but-for retaliation causation standard allows a plaintiff "to demonstrate causation at the *prima facie* stage on summary judgment or at trial indirectly through temporal proximity." *Kwan v. Andalex Group LLC,* 737 F.3d 834, 845 (2d Cir. 2013).

While about three and a half months passed between the Facility's receipt of the notice of charge and Plaintiff's termination, periods as long as five months have been deemed sufficiently proximate in time to allege a causal relationship for a prima facie case of retaliation. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). Also, although Bonura told Plaintiff that the Facility had received a copy of his EEOC charge and that he would receive a hearing regarding his April 15 union grievance on April 30, 2013, the hearing never occurred. *See Eldaghar v. City of N.Y. Dep't of Citywide Admin. Servs.,* No. 02 Civ. 9151, 2008 WL 2971467, at *12–13 (S.D.N.Y. July 31, 2008) (finding evidence of procedural irregularities to raise "genuine issues of material fact regarding . . . retaliatory motivation"); (Pl.'s Aff., at ¶ 113). Thus, a reasonable jury could conclude that Plaintiff's termination had a causal connection to his EEOC complaint, and that Plaintiff has established a prima facie case of retaliation.

---

[12] Plaintiff also contends the disciplinary write-ups he received in late April and early May of 2013 within two weeks of the Facility receiving notice of his charge of discrimination are causally connected.

### 4. Non-Retaliatory Rationale

Once an employee establishes a prima facie case, the burden of production shifts to the

employer to put forth evidence of a non-retaliatory rationale for the adverse employment action.

*See Cox*, 760 F.3d at 145 (citing *Holt,* 95 F.3d at 130).

Defendants proffer that Plaintiff was terminated for insubordination.  More specifically,

Plaintiff brought a recording device to the July 29 meeting and informed Elezovic that he was

going to record the meeting. (*See* Defs.' 56.1 Stmt., at ¶¶ 167-170.)  Elezovic asked Plaintiff to

turn off the device, and then asked Patricia Sikorski, a former union shop steward, to explain to

Plaintiff that if he did not follow Elezovic's directive, he would be terminated.  (*Id.*, at ¶ 171.)

Sikorski explained as much to Plaintiff, but Plaintiff insisted on recording the conversation as

advised by his attorney.  (*Id.*, at ¶¶ 172-73.)  Elezovic asked Plaintiff twice more to turn off the

recording device, and when Plaintiff continued to refuse, Elezovic terminated him.  (*Id.*, at ¶¶

174-75.)

Generally, insubordination and conduct that disrupts the workplace are legitimate reasons

for firing an employee.  *Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d

114, 125-26 (2d Cir. 2008) (affirming grant of summary judgment on retaliation claim where

district court found that Plaintiff was terminated because of insubordination and hostile

behavior).  Here, Defendants presented undisputed evidence of Plaintiff's insubordination at the

July 29 meeting.  (*See* Defs.' 56.1 Stmt., at ¶¶ 171-75.)  Furthermore, it is also undisputed that,

as a former union shop steward himself, Plaintiff was aware that disagreeing with a workplace

directive is properly handled not with insubordination, but rather by following the directive, and

then filing a grievance later.  (*Id.* at ¶¶ 111-13; Mem. at 17 n.8.)  Defendants have therefore

proffered a legitimate, non-retaliatory reason for terminating Plaintiff.

### 5. Pretext

Once the employer has provided a legitimate non-retaliatory reason for the adverse employment action, the employee may still prevail by demonstrating that the stated rationale is mere pretext. *Jute,* 420 F.3d at 173, 179–80.  The employee at all times bears the burden of persuasion to show a retaliatory motive. *Cosgrove,* 9 F.3d at 1039.

Plaintiff does not dispute the facts surrounding his insubordination. (See Pl.'s 56.1 Stmt., at ¶¶ 167-175.)  Plaintiff provides no factual evidence that Defendant's proffered reason, insubordination, is merely a pretext for retaliation.  Instead, Plaintiff provides a recitation of incidents where Elezovic's behavior towards Plaintiff became unpleasant every time Plaintiff complained about something.  (Opp'n at 19 (citing Pl.'s Aff., ¶¶ 104-117).)  However, as this Circuit has recognized, "a party cannot create a triable issue of fact merely by stating in an affidavit the very proposition they are trying to prove." *Hicks*, 593 F.3d at 167.  Nor does Title VII "set forth 'a general civility code for the American workplace,'" as this Circuit has reminded plaintiffs, time and again. *See e.g.*, *Redd v. N. Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (quoting *White*, 548 U.S. at 68 (internal citation omitted)).

Plaintiff also argues that the meeting was not necessary, and therefore, pretextual. According to Plaintiff, Elezovic could have written a note stating that Plaintiff was to stop cleaning Bonura's office as it contained documents concerning his EEOC complaint and this litigation. (Tr. at 72:1-6.)  Plaintiff also noted that Elezovic did not have to fire Plaintiff for refusing to turn off the recording device, but could have declined to have the meeting. (*Id*. at 70:3-4.)  However, "bad management is not the same thing as . . . discrimination," retaliation, or other actions prohibited by Title VII. *Dobrynio v. Cent. Hudson Gas & Elec. Corp.*, 419 F. Supp. 2d 557, 566 (S.D.N.Y. 2006).  Furthermore, courts in this District have recognized that

disagreement with the validity of the proffered reason for an adverse employment decision "does not, by itself, create a triable issue of fact." *Risco v. McHugh*, 868 F. Supp. 75, 104 (S.D.N.Y. 2012) (quoting *Fleming v. MaxMara USA*, 644 F. Supp. 2d 247, 266 (E.D.N.Y. 2009)).

Without more specific evidence of a retaliatory motive, such as factual discrepancies regarding Defendants' proffered reasons, Plaintiff has not carried his burden of production or persuasion as to whether insubordination was merely a pretext for retaliation on this record. *See D'Amico*, 132 F.3d 149 (holding that, to show a genuine dispute of material fact, the nonmoving party must provide "hard evidence"). Defendants' motion for summary judgment as to Plaintiff's retaliation claim is GRANTED.

## VI. EMOTIONAL DISTRESS CLAIMS

Plaintiff brings an unspecified inflicted emotional distress claim against Defendants. (Opp'n at 8-9.) This Court addresses both negligent and intentional theories of liability.

To prevail on a claim for negligent infliction of emotional distress, Plaintiff must show either that 1) he suffered an emotional injury resulting from Defendants' breach of a duty that unreasonably endangered his physical safety (the "direct duty" theory); or, 2) Defendants' negligence threatened him with physical harm, and as a result, he suffered emotional injury from witnessing the death or serious bodily injury of an immediate family member (the "bystander" theory). *Mortise v. U.S.*, 102 F.3d 693, 696 (2d Cir. 1996) ("Under New York law, a plaintiff may establish [a claim for negligent infliction of emotional distress] in one of two ways: (1) the 'bystander' theory; or (2) the 'direct duty theory.'"). With respect to Plaintiff's claims of negligent infliction of emotional distress, Defendants correctly argue that Plaintiff has provided no evidence Defendants threatened him with physical harm or endangered his safety in any way.

*See Mortise*, 102 F.3d at 696.  Plaintiff is therefore unable to demonstrate a genuine issue of material fact as to this claim.

To prevail on an intentional infliction of emotional distress claim, Plaintiff must show: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. N.Y. Post Co.,* 596 N.Y.S.2d 350, 353 (1993). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citations omitted); *see also Martin v. Citibank, N.A.,* 762 F.2d 212, 220 (2d Cir. 1985) (rejecting intentional infliction of emotional distress claim in case involving employer's alleged racial discrimination); *cf. Silberstein v. Advance Magazine Publishers, Inc.,* 988 F. Supp. 391, 394 (S.D.N.Y. 1997) ("[I]t seems to this Court extraordinarily unlikely that [New York courts] would allow liability for employment discrimination on the intentional infliction theory in the face of the Legislature's enactment of a more limited [statutory] remedy.").

Plaintiff has also failed to provide evidence that shows a genuine issue of material fact regarding "extreme or outrageous conduct" toward him so as to be "beyond all possible bounds of decency." *See Howell,* 596 N.Y.S.2d at 353.  Nor is Plaintiff's submission of two doctors' notes (dated April 18 and April 25, 2013) a sufficient factual basis for a reasonable juror to find that Plaintiff's stress was severe enough to satisfy the second element. (*See* Opp'n, Ex. 8.) Therefore, Defendants' motion for summary judgment as to Plaintiff's claims for negligent and intentional infliction of emotional distress is GRANTED.

## CONCLUSION

Defendants' motion for summary judgment is hereby GRANTED in its entirety.[13]   This

Order resolves the motion at ECF No. 34.

The Clerk of the Court is directed to enter judgment accordingly and close this case.


Dated: New York, New York
       March 18, 2016

                                        SO ORDERED.

                                        *George B Daniel*

                                        GEORGE B. DANIELS
                                        United States District Judge

---

[13] To the extent that Plaintiff brings a claim under the Federal Nursing Home Reforms Act ("FNHRA"), which was contained in the Omnibus Budget Reconciliation Act of 198, this claim is dismissed because FNHRA does not afford litigants a private cause of action, Defendants are not state actors, and the statute benefits residents, not employees. *Baum v. Northern Dutchess Hosp.*, 764 F. Supp. 2d 410, 419-420, 422 n.13, 423-433 (N.D.N.Y. 2011).